# IN THE COURT OF APPEALS OF IOWA

No. 18-0454
Filed February 6, 2019

IN RE THE MARRIAGE OF BRIDGETT MARIE WOOD
AND CLINTON ANDREW WOOD

Upon the Petition of
**BRIDGETT MARIE WOOD,**
        Petitioner-Appellee,

**And Concerning**
**CLINTON ANDREW WOOD, n/k/a CLINTON ANDREW LUNDEN,**
        Respondent-Appellant.
_____

Appeal from the Iowa District Court for Linn County, Andrew Chappell, Judge.

Clinton Lunden appeals the physical care, visitation, and child support provisions of the decree dissolving his marriage to Bridgett Wood. **AFFIRMED AS MODIFIED.**

Mark D. Fisher of Nidey Erdahl Fisher Pilkington & Meier, PLC, Cedar Rapids, for appellant.

Crystal L. Usher of Nazette, Marner, Nathanson & Shea, LLP, Cedar Rapids, for appellee.

Heard by Tabor, P.J., Bower, J., and Mahan, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2019).

**MAHAN, Senior Judge.**

Clinton Lunden appeals the physical care, visitation, and child support provisions of the decree dissolving his marriage to Bridgett Wood. Upon our review, we affirm as modified to provide Clinton additional visitation during the summer.

## I.     *Background Facts and Proceedings*

Clinton and Bridgett married in 2009.[1] They have two children together, I.W. and F.W., born in 2011 and 2014. Clinton and Bridgett purchased a home in Cedar Rapids in 2008, where they lived until they separated. Clinton shared physical care of two children from a prior marriage, who also lived with them when they were not with their mother.

Clinton is thirty-eight years old. He has a degree in human services. He worked for ASAC from 2008 to 2015. He has also worked as a journeyman plumber and a custodian. He has some physical injuries relating to prior worker's compensation claims, and he has two pending worker's compensation claims. He has been unemployed since July 2016. He testified he has applied for disability and was approved through vocational rehabilitation to be educated in a different field. Clinton testified he receives financial assistance through monetary gifts from a couple he refers to as his godparents.

Bridgett is twenty-nine years old. She has degrees in criminal justice and business management and a master's degree in business administration. She worked for the Linn County Auditor's Office until 2016 and then at an appliance

---

[1] Pursuant to an affidavit executed in 2008, Clinton and Bridgett declared themselves to be common law married in 2006.

store in Iowa City. At the time of trial in August 2017, Bridgett testified she was seeking different employment in order to receive better health insurance and benefits and she was applying for jobs in the Iowa City, Cedar Rapids, and Waterloo areas.

The parties separated in late 2015, and Clinton moved from the family home. Bridgett filed a petition for dissolution of marriage in November 2015. That same day, she filed a petition for relief from domestic abuse, alleging physical abuse and threats by Clinton. The district court entered a protective order by consent agreement.[2]

In January 2016, the district court entered an order on temporary matters, ordering physical care of the children with Bridgett and visitation with Clinton overnight every Tuesday and Thursday and every other weekend.[3] The temporary order found it "equitable to impute income to [Clinton] at the level he was earning before becoming unemployed in September 2015" and ordered Clinton to pay child support in the amount of $565.81 per month. Bridgett was ordered to continue to maintain health insurance for the children.

Bridgett remained in the marital home until September 2016, when the home was foreclosed and she moved into an apartment. Bridgett began a relationship with Brian, who was on parole for convictions of robbery and willful injury stemming from an incident when he was nineteen years old. Brian testified

---

[2] At Bridgett's request, the court extended the no-contact order for an additional year in November 2016.

[3] The court ordered the weekend visitations to coincide with the weekends Clinton had his other children.

he had "grown up a lot" following the incident and his time in prison, and he stated he no longer used drugs.

Clinton moved in with his girlfriend Angela in Hiawatha in October 2016. Angela also has no children. Both Clinton and Bridgett testified to the long term plans of their respective relationships. Testimony presented from both parties' witnesses indicated Brian and Angela were supportive and stable influences for the parties' children.

Clinton, without consulting Bridgett, began services through Tanager Place for I.W. Although Bridgett did not agree to the services, she participated. There was no indication I.W. needed to continue attending therapy, and Bridgett was concerned Clinton would also enlist services for F.W.

Trial took place over three days in August 2017. The main issue before the court was which party would receive physical care of the children. The court heard testimony from Bridgett, Brian, two of the children's previous daycare providers, the parties' former neighbor, Bridgett's sister, Clinton, Angela, Clinton's ex-wife, Clinton's ex-wife's husband, two Tanager Place caseworkers, Clinton's mother, and Clinton's godmother.

At the time of trial, I.W. was five years old and just starting first grade; she was described as smart, creative, loving, and caring. F.W. was two years old and just starting preschool; he was described as bright, fun, and playful.

In October 2017, before the court entered a decree, Clinton filed a motion to reopen the record, alleging Bridgett had located employment in Waterloo and intended to move there with the children. The court allowed the parties to supplement their trial testimony by affidavit to be heard on the issue of Bridgett's

new employment and relocation. Bridgett's affidavit confirmed she had obtained employment with the Black Hawk County Public Health Department, earning $48,000 (an increase of approximately $12,000 per year) starting October 23. Bridgett stated she would have "significant" benefits after sixty days of employment, including health, dental, and vision insurance for herself and the children. She further stated she had researched housing "in the Urbana area," but she was unable to find any three-bedroom apartments or homes in her price range; instead, she planned to move into the home Brian had recently purchased in Waterloo so they could share expenses. Bridgett stated she had enrolled F.W. in daycare and I.W. in elementary school in Waterloo, to start at the beginning of the next trimester. Bridgett acknowledged the move would result in the parties living "47 minutes apart," which was "30 minutes more" than they currently lived, but she believed it was in the children's best interests for her to accept the job due to the increase in pay and because it was the only offer she had received after applying for many different jobs.

Clinton responded, essentially refuting Bridgett's statements that she could not find housing in Urbana and that the Black Hawk County job was the only one available to her. He acknowledged he was behind on child support but stated he pays "what I currently am able."[4] Clinton also stated he "offer[ed] to watch the children," but Bridgett "chose to incur daycare costs."

In December 2017, the district court entered its decree, ordering joint legal custody of the children and physical care to Bridgett with liberal visitation to Clinton

---

[4] Bridgett testified as of July 25, 2017, Clinton owed $2233.34 in back child support.

("as agreed upon by the parties," or if they could not agree, every Wednesday overnight and every other weekend, Friday to Monday morning). The court "imputed $11 per hour of fulltime income, for $22,500 annually" to Clinton, and after giving credit for extraordinary visitation, ordered him to pay child support in the amount of $432 per month. The court distributed the marital assets,[5] and the court ordered Clinton to pay $3800 of Bridgett's attorney fees.

Clinton filed a motion to modify, amend, or enlarge, which the district court denied. Clinton appeals.

## II. *Scope and Standard of Review*

We review dissolution cases, which are tried in equity, de novo. Iowa R. App. P. 6.907; *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 483-84 (Iowa 2012). While we give weight to the factual findings of the district court, especially when considering the credibility of witnesses, we are not bound by them. Iowa R. App. P. 6.904(3)(g). "Precedent is of little value as our determination must depend on the facts of the particular case." *In re Marriage of Fennelly*, 737 N.W.2d 97, 100 (Iowa 2007) (citation omitted).

## III. *Physical Care*

Clinton appeals the district court's decision placing the children in Bridgett's physical care. At trial, both parents requested physical care, and Clinton requested shared physical care only in the alternative.[6] "Physical care" involves "the right

---

[5] The court noted the parties had both emerged from bankruptcy proceedings and "[r]egarding personal property, . . . have very little to divide." Property distribution provisions of the decree are not at issue on appeal.

[6] The court must consider joint physical care if requested by either party, *see* Iowa Code § 598.41(5)(a) (2015). Although the district court observed, "One could interpret these positions as an agreement that joint physical care is not appropriate for the parties," the court stated it would still consider joint physical care.

and responsibility to maintain a home for minor child and provide for the routine care of the child." Iowa Code § 598.1(7). We consider a number of factors in determining which parent should have physical care of a child. *See id.* § 598.41(3); *In re Marriage of Winter*, 223 N.W.2d 165, 166-67 (Iowa 1974). The fundamental goal in determining physical care of a child in an action for dissolution of marriage is to place the child in the care of the parent who will likely accommodate the long-range best interests of the child. *Winter*, 223 N.W.2d at 167. "[T]he basic framework for determining the best interest of the child" is well established. *In re Marriage of Hansen*, 733 N.W.2d 683, 691 (Iowa 2007); *see* Iowa Code § 598.41. "The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Hansen*, 733 N.W.2d at 695.

Clinton contends he should be awarded physical care of the parties' children. To support his contention, Clinton claims: "[t]he credibility determinations of the district court do not hold up under this review"; "[t]he factors of continuity and stability strongly weigh in favor of placement of [the children] with Clint"; he has "always put the children first" whereas "Bridgett had other priorities"; "Bridgett does not value Clint as a parent, and does not have any ability to support his relationship with the children"; and "denying [the children] the ability to be together [with his older children] is not in their best interests." We address these contentions in turn.

The district court's decree included detailed findings of fact and credibility determinations. Without reciting each of the court's credibility determinations, we observe the court found Clinton's testimony "self-serving" and "not at all convincing"; "When testifying, he made a constant habit of equivocating instead of

providing direct, honest answers." And although the district court acknowledged "some of Bridgett's testimony [about Clinton's controlling actions] appeared to be somewhat overstated," the court concluded "it was still more convincing than Clinton's about these matters." Moreover, the court found Bridgett's testimony to be corroborated by other witnesses. Specifically, the court found Bridgett's testimony regarding a history of domestic violence by Clinton to be "largely corroborat[ed]" by Clinton's ex-wife,[7] who Clinton called as a witness. The court further found Bridgett's testimony regarding Clinton's controlling and angry actions to be "corroborated" by Bridget's sister, who the court observed to be "very credible overall." It is unclear why Clinton would choose to draw attention to the court's credibility determinations when the record clearly belies his contention. We give the district court's findings considerable weight. *See In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984).

"[S]tability and continuity of caregiving are important factors that must be considered in custody and care decisions." *Hansen*, 733 N.W.2d at 696. In determining the best interests of the children, a parent's ability to maintain stability in a child's life is significant. *See id.* The fact that I.W. and F.W. have changed daycare providers is in part due to Bridgett's change in employment; we cannot fault Bridgett for the steps she took to secure employment that allows her to better provide for the children, particularly given the circumstances of Clinton's unemployment. Change is a natural result of divorce, and it appears both parties

---

[7] Clinton's ex-wife has a diagnosis of post-traumatic stress disorder relating from domestic abuse from Clint "amongst many other things." She also had a prior no contact order against Clinton.

have adapted to find more stability as they have established lives separate from each other.

Clinton and Bridgett both testified they were the primary caregivers for the children, but the district court found, and we agree, that "the record supports a finding that they likely divided parenting responsibilities relatively evenly given their respective schedules over the course of the marriage." The record in this case is extensive and there is more than enough acrimony between these parties as a result of these proceedings; we need not reiterate their views of the other's shortcomings. It is apparent both parties were greatly involved in the children's lives. The testimony at trial indicates the parties are both able to provide for the children's physical and emotional needs.

"The parent awarded physical care is required to support the other parent's relationship with the child." *Id.* at 700. The district court found "both parties have severe communication issues and issues showing mutual respect." And the court observed Bridgett "could be somewhat more flexible in adjusting the children's schedule when possible." But overall, we believe Bridgett is capable of working with Clinton to co-parent the children effectively and working with Clinton to resolve issues in the best interests of the children.

Clinton also claims the court erred by separating I.W. and F.W. from their half-siblings. We recognize there is a strong interest in keeping siblings together, and this includes half-siblings. *Yarolem v. Ledford,* 529 N.W.2d 297, 298 (Iowa Ct. App. 1994). However, circumstances can arise which demonstrate that separation is in the long-term best interest of the children. *Id.* In this case, we find,

as did the district court, that the long-term interests of I.W. and F.W. in this case are best served by being in the physical care of Bridgett rather than Clinton.

The overriding concern is the best interests of the children. Iowa R. App. P. 6.904(3)(o); *In re Marriage of Will*, 489 N.W.2d 394, 397 (Iowa 1992). We conclude it is in the children's best interests to be placed in the physical care of Bridgett. Upon our de novo review of the record and the nonexclusive factors set forth in section 598.41 and Iowa law, along with a careful study of the issues raised by Clinton on appeal, we affirm the physical care decision made by the district court.

## IV.    *Visitation*

Clinton requests increased visitation "[i]n the event the Court declines to grant [him] physical care." The district court afforded Clinton liberal visitation,[8] including every Wednesday overnight and every other weekend, Friday afternoon to Monday morning, as well as two non-consecutive weeks during the summer. Clinton's proposal of two overnights every week is not feasible considering the distance between the parties and the location of their school and daycare provider. Moreover, as the district court noted, the parties are free to agree upon additional visitation, and the court was "hopeful" "better flexibility will be forthcoming from both parents" "once the specter of divorce has lifted."

Clinton also requests six weeks, rather than two weeks, of visitation during the summer. We modify the decree to provide Clinton an additional two weeks of

---

[8] Clinton mistakenly states the district court "limited [his] contact with his children to four nights every two weeks," but the decree provides Clinton five nights every two weeks.

visitation in the summer.  We see nothing in the record to indicate that four weeks of summer visitation is inconsistent with the best interests of the children.

## V.      *Imputation of Income to Clinton*

The district court calculated child support under the guidelines adopted by the Iowa Supreme Court.  *See* Iowa Ct. R. 9.2.  The court used Bridgett's annual income of $48,000 and determined "some level of income should be imputed to Clinton."  At trial, Clinton testified he worked for ASAC from 2008 to 2015, where he "started out [at] like $15 an hour."  Clinton testified he was currently unemployed, seeking vocational rehabilitation, and had several worker's compensation claims pending.  The district court found, "Given his education and prior experience, but factoring his physical limitations, . . . Clinton should be imputed $11 per hour of fulltime income, for $22,880 annually."

Clinton contends the court's "deviation from the Child Support Guidelines and imputation of income . . . is unjust, unfair, and unsupported by the record." Iowa Court Rule 9.11(4) allows a court to impute income to a parent "in appropriate cases."  The rule identifies one appropriate case as a parent's unemployment or underemployment "without just cause."  Iowa Ct. R. 9.11(4).  "One of the factors we consider in determining if we will use a parent's earning capacity, rather than a parent's actual earnings, in order to meet the needs of the children and do justice between the parties is whether the parent's inability to earn a greater income is self-inflicted or voluntary."  *In re Marriage of McKenzie*, 709 N.W.2d 528, 533 (Iowa 2006).  Here, the district court was "convinced that Clinton has the ability to work,"

but he "has no employment and no good plan for securing it."[9]  Under these circumstances, the court acted equitably in using an amount reflective of Clinton's earning capacity rather than his actual income.  *Cf. id.* at 534.

## VI.    *Trial Attorney Fees*

Clinton contends the district court abused its discretion in ordering him to pay $3800 of Bridgett's trial attorney fees.[10]  Whether attorney fees should be awarded depends on the parties' respective abilities to pay.  *In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006).  In addition, the fees must be fair and reasonable.  *In re Marriage of Guyer*, 522 N.W.2d 818, 822 (Iowa 1994).  An award of trial attorney fees rests in the sound discretion of the trial court and should not be disturbed on appeal in the absence of an abuse of discretion.  *In re Marriage of Romanelli*, 570 N.W.2d 761, 765 (Iowa 1997).

Considering the district court's fact findings regarding Clinton's finances, including but not limited to the monetary gifts and loans from his godparents, removal of money from the parties' joint bank account, and misrepresentations about his worker's compensation settlement, we do not believe the court abused its discretion in ordering him to pay a portion of Bridgett's attorney fees.

## VII.    *Appellate Attorney Fees*

Both parties seek an award of appellate attorney fees.  An award of appellate attorney fees is not a matter of right but rests within this court's discretion.  *In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007).  In determining

---

[9] The court further noted Clinton "owes significant back child support, despite being ordered to pay a minimal amount."

[10] The court specified, "Due to Clinton's current financial situation, he shall make monthly payments of no less than $100 on this obligation."

whether to award attorney fees, we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the district court's decision on appeal. *Id.* In consideration of these factors, we decline to award either party attorney fees on appeal. Costs on appeal are assessed equally between the parties.

**AFFIRMED AS MODIFIED.**